# EXHIBIT 2

Report of Dr. Eric Drogin, J.D., Ph.D., ABPP

# Eric Y. Drogin, J.D. Ph.D., ABPP

**Clinical and Forensic Psychologist**
**Attorney at Law**

**4949 Old Brownsboro Road**
**Louisville, Kentucky 40222-6424**

04 March 2025

Ryan Robey, Esquire
*Cooley Iuliano Robey, PLLC*
201 West Short Street, Suite 500
Lexington, Kentucky 40507

                RE:    ***U.S. v. James Clark***
                        *U.S. District Court, Western District of Kentucky*
                        *Case Number #1:23CR00037-1*

Dear Attorney Robey:

Following is a report of assessment results in the above-styled matter, pursuant to a forensic psychological examination that was conducted in February 2026 at the Bourbon County Detention Center in Paris, Kentucky.

EVALUATION MEASURES EMPLOYED

The following psychological testing measures were employed in your client's evaluation, in addition to clinical and forensic interviewing and a review of currently available legal and clinical documentation:

    --    *Beck Anxiety Inventory (BAI)*

    --    *Beck Hopelessness Scale (BHS)*

    --    *Cognitive Capacity Screening Examination (CCS)*

    --    *Multimodal Life History Inventory (MLHI-3)*

    --    *Rey's Fifteen Item Test (Rey's Test)*

    --    *Structured Inventory of Malingered Symptomatology (SIMS)*

(339) 200-9131 (voice)     (339) 200-3025 (facsimile)     eyd@drogin.net     edrogin@bidmc.harvard.edu

Diplomate in Forensic Psychology, American Board of Professional Psychology
Registrant, National Registry of Health Service Psychologists

*U.S. v. James Clark*  
*Forensic Psychological Evaluation* 2

DESCRIPTION OF EXAMINATION AND RESULTS

Mr. Clark was examined for approximately six hours on 28 February 2026 at the Bourbon County Detention Center in Paris, Kentucky. Informed of the limitations of confidentiality regarding forensic mental health assessment, your client agreed to participate in this evaluation subsequent to a full explanation of its nature and purpose.

Presenting as a 40-year-old adequately groomed and institutionally attired male, Mr. Clark was polite, cooperative, and responsive upon introduction, without any discernible speech defects. No overt indicia of psychosis or apparent physical distress were noted. Your client repeatedly denied any feelings, plans, or intent to harm either himself or anyone else.

Mr. Clark stated that he had consumed breakfast prior to this late morning appointment, and that he had slept for approximately six and one half of the preceding 24 hours. No auditory, visual, or acute physical conditions were identified that might interfere with the assessment process. Current medications included Clobetasol Propionate, Lamictal, Lisinopril, Metoprolol, Protonix, Prozac, Triamcinolone, and Tricor.

The **CCS** was administered in order to screen for the presence of any acute cognitive deficits. Mr. Clark's raw score of 30 out of a possible 30 points on this measure did not identify any difficulties with orientation, abstract reasoning, calculation, concentration, or short-term memory functioning.

**Rey's Test** was utilized to address the potential malingering of neuropsychological impairment. Mr. Clark's raw score of 15 out of a possible 15 points on this measure did not depict him as attempting to feign a functional disability in this regard.

**BHS** testing addressed Mr. Clark's perspective on future life events. His raw score of 1 out of a possible 20 points on this measure fell within the normal range of affective experience.

**BAI** testing was administered in order to assess Mr. Clark's reporting of current and recent symptoms of anxiety. His raw score of 15 out of a possible 63 points on this measure fell within the mild to moderate range of affective disturbance.

The **SIMS** was used in order to screen for the accuracy and consistency of claimed symptoms of major mental illness. Mr. Clark's raw score of 8 out of a possible 75 points on this measure provided further assurance that he was neither fabricating nor exaggerating a major psychiatric condition.

The **MLHI-3** was employed as a source of additional background information. In this context, Mr. Clark conveyed how he was subjected to multiple incidents of child sexual abuse. He also described both witnessing and being victimized himself by domestic violence. Despite a failure of prior interventions, during which for example he could not "open up in therapy as a child," your client expressed hope that he might yet manage to heal from Posttraumatic Stress Disorder (PTSD) if assisted by an "expert" who would "know their stuff."

*U.S. v. James Clark*  3
*Forensic Psychological Eva1uation*

When interviewed on this occasion, Mr. Clark confirmed a history of psychiatric problems that included Attention-Deficit/Hyperactivity Disorder (ADHD), sensory integration difficulties, depression, and anxiety. He professed to "really, honestly, definitely need treatment" for the conditions that had contributed to his arrest in this matter, and stated that it was his intention to "continue intense therapy" for "the rest of my life."

Mr. Clark asserted that he would "do anything" in order to be able to prevent what had happened to the victims in this case. He acknowledged feeling "very remorseful," and offered specifically that he was "sympathetic to the pain and psychological damage that I caused."

CONCLUSIONS AND RECOMMENDATIONS

Mr. Clark does not present with either an intellectual developmental disability or a psychotic illness. He handily passed two separate tests designed to identify the presence of Malingering. In light of his sound cognitive functioning, his cooperativeness with the assessment process, his psychometrically established candor, his genuine desire to obtain proper help for the problems he faces, his readily discernible remorse, and the amenability of his previously identified conditions to standardized treatment, your client presents as an excellent candidate for success in therapy.

Sexual offenders are treated differently when placed in the general population, and are frequently targeted for assault, extortion, and hazing. They are also routinely excluded from recreational activities and consigned to separate areas of the facility for meals and other basic functions. The goal for persons in  find an institution that not only offers programming but that is also safe for Mr. Clark.

FCI Marion has both a Non-Residential Sex Offender Treatment Program and a Residential Sex Offender Treatment Program. These are both programs in which Mr. Clark has expressed an interest in participating. This type of facility also ensures that there is a sufficient population of inmates with sex offenses, as there is a certain "safety in numbers."

The Bureau of Prisons periodically updates its Directory of National Programs, including location changes. Over the course of Mr. Clark's incarceration, he may become eligible for certain programs and, with BOP approval, could participate. Such participation may of course necessitate his being transferred to another facility. Your client's transfer to FCI Marion would greatly help him to adjust to incarceration and to finally receive the treatment he needs.

Sincerely,

Eric Y. Drogin, J.D., Ph.D., ABPP
Licensed Clinical Psychologist